Syllabus.

SAM LEWIS *v.* THE STATE.

[Galveston Term, 1883.]

1. JURY LAW—SHERIFF'S RETURN OF SPECIAL VENIRE.—Article 614 of the Code of Procedure requires that the sheriff's return of a special venire shall state the names of the veniremen who have been summoned, "and if any of those whose names are upon the list have not been summoned, the return shall state the diligence that has been used to summon them and the cause of the failure to summon them." *Held*, that the latter requirement is complied with by a return which, naming certain of the veniremen, states that they were "out of F. county, and could not be found, though diligent search was made for them by the sheriff of F. county and his deputies," and which, naming others, states that they "could not be found in F. county, though diligent search was made for them at their residences and places of business, and at any point at which they were likely to be found."

2. CONTINUANCE—DILIGENCE.—Defendant's motion for a continuance alleged that one of his attached witnesses had been released without his authority or that of his counsel, eight days before the cause was reached for trial; but the motion failed to show that the defendant did not learn that fact in time to have obtained new process and service on the witness, who lived in an adjoining county. *Held*, that the showing of diligence is insufficient.

3. CONTINUANCE—COMPETENCY OF THE DESIRED TESTIMONY.—In stating the testimony expected of the absent witness, the motion must show it to be competent. If the witness is wanted for the purpose of proving certain statements made by the defendant himself, the motion should show that they were part of the *res gestæ*, or were competent for some other reason.

4. EVIDENCE.—That a witness did not state at a former trial everything which he states at the pending one is not a contradiction when there is no inconsistency between his statements on the two occasions, and when his attention was not called at the first trial to the new matter of which he speaks at the pending one.

5. JURY LAW—CHALLENGE.—That a defendant's challenge for cause was improperly overruled, and he was thereby forced to the peremptory challenge of a disqualified juror, is not error of which he can complain unless he exhausted his peremptory challenges before a full jury was obtained.

6. JURY LAW—BIAS.—A juror acknowledged on his *voir dire* that when he first heard of the homicide he said the defendant ought not to have killed the deceased, but denied that he had formed or entertained any opinion about the case. *Held*, that the juror was not disqualified.

7. PRACTICE.—The defense reserved exceptions on the ground that, during the progress of the trial, the judge absented himself from the bench and court room without notice to counsel, and that during his absence the State's counsel proceeded with the examination of a State's witness, and when the defense objected to the manner of interrogation there was no judge present to sustain or overrule the objection, and illegal and dam-

aging evidence went to the jury. But the judge's explanation states that his absence was very brief and of necessity, and he supposed the counsel had taken notice of it; that counsel for the defense did not complain of any evidence introduced during the interval, but said he had objected to some testimony, and counsel for both sides said they were awaiting the judge's return, and the defendant's objections to the testimony were then presented. *Held*, first, that the bill of exceptions is defective because it does not disclose what the illegal testimony was; second, that the momentary absence of the judge was not erroneous under the circumstances; and, third, if illegal evidence was elicited during the judge's absence, a motion to exclude it was the proper remedy.

8. MURDER—EVIDENCE.—Appellant was tried in 1882 for a murder committed in 1879, and his counsel objected to the testimony of a State's witness because he was unable to give the year in which the killing occurred. But his testimony clearly related to the homicide in question, and its date was fully proved by other witnesses. *Held*, that the objection was properly overruled.

9. PRACTICE.—The trial court did not err in refusing to grant the defense time to take down the testimony while the witnesses were being examined.

10. SAME.—The defense reserved an exception because the trial court refused to admit the evidence of the magistrate who held the inquest on the body of the deceased, in 1879, in the absence of "the papers." The bill of exceptions fails to show what "papers" it refers to, and the trial court did receive the evidence of the magistrate except with regard to the loss of the record of the inquest; and the State admitted the loss of that record, and conceded the right of the defense to prove its contents. *Held*, that no error is apparent in the ruling of the trial court.

11. SAME.—The defense excepted because the judge, after giving to the jury his written charge, instructed them verbally not to cast lots in coming to a verdict. *Held*, that this was not error.

12. SAME.—Exception that "the court erred in the charge" is too vague to invoke a revision of the charge given to the jury by the trial court. But in felony cases it is the practice of this court to revise the instructions given to the jury. See the statement of the case for a charge in a trial for murder held to be adequate and correct.

13. NEW TRIAL—NEWLY DISCOVERED EVIDENCE, as cause for a new trial, is not sufficient when its materiality, probable truth, and exculpatory nature are not made manifest.

14. MURDER IN THE FIRST DEGREE—EXPRESS MALICE—EVIDENCE.—Murder in the first degree can be perpetrated by other means than those specified in Article 606 of the Penal Code, and the express malice which characterizes it may be evidenced by other external circumstances besides lying in wait, antecedent menaces, former grudges, and concocted schemes. Even in a sudden difficulty, homicide may be committed under circumstances of such enormity, cruelty, or deliberate malignity as will suffice to show that it was done with express malice, and is murder in the first degree. See the opinion of the court *in extenso* on this subject.

15. MURDER IN THE FIRST DEGREE—FACT CASE.—See evidence *held* sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Fayette. Tried below before the Hon. L. W. Moore.

By indictment, filed in the District court of Fayette County, on November 17, 1879, the appellant was charged with the murder of William Finkelstien, on the twenty-first day of October, 1879, by striking him on the head with a shovel. The conviction was for murder in the first degree, and the punishment awarded by the jury was confinement in the penitentiary for the term of his natural life. The trial was had in November, 1882.

Nat Holman was the first witness for the State. He testified, in substance, that he knew the defendant, but was not acquainted with William Finkelstien, the deceased. The first and only time he ever saw the deceased was at his, the witness's, gin, in Fayette county, Texas, on the evening of ———, 1879. Deceased was then alive, but suffering from a wound on the right side of his head, just above and behind the ear. The wound was about two and a half or three inches long and about a half inch deep. The skull was crushed in, but the skin was not broken. The indentation was large enough to hold an egg. When the witness reached his gin that day, he found the deceased lying on some bagging under the cotton shed, wounded as described, with the blood flowing from his nose, mouth and ears. He was then alive, but speechless. He muttered unintelligibly several times before his death, which occurred some four hours afterward. Several persons were with the deceased when the witness reached him, and were pouring water over his head, among whom Cellis Holman and Felix Bridge.

Cellis Holman showed the witness the shovel with which the wound was said to have been inflicted. The witness knew the shovel well. It had been in use at the gin for several years, being used for shoveling cotton seed. It was a large iron shovel, with a handle about four feet long, and weighed some eight or ten pounds. At the place where the handle fitted in, commonly called the eye, there was a double thickness of the iron, making the entire thickness of the iron at that place about a quarter of an inch. Witness bought this shovel because of its peculiar make, and had never seen another like it. If the wound on the deceased was actually inflicted by this shovel, he must have been stricken with the eye of it, as no other part of the shovel would make such character of wound. Witness did not go up into the gin that day, but went up there the next day

---

Statement of the case.

---

Proceeding with his testimony, the witness said: "When I went up into the gin next morning, I found, in the main room, a pool of blood, about the middle of the walk running from the front door back to the gin stand. This pool of blood was near where the shaft comes up through the floor. It was at a point about opposite the middle of the second left hand cotton seed stall, as you go into said room from the front door. There were three cotton seed stalls on the right hand side as you went in said room from the front door, and each stall was separated from the other by a plank partition. There were also three stalls on the left hand side, but the one nearest to the gin was a sort of half stall. These stalls were usually filled with cotton seed. A man standing at the gin stand could not see to the floor where the blood was, but could have seen, around the corner of the second stall, any person standing erect. I have owned the gin for several years, and am perfectly familiar with its interior." Witness saw the defendant just before the killing, but saw no more of him until the last term of the court.

On cross-examination, the witness stated that he was not present, and knew but little about the killing. He reached the gin about two o'clock p. m. He had no recollection of having previously seen the deceased. He was not at the witness's house on that morning. Morgan Braker, Cellis Holman, Felix Bridge, and four or five transient white men were at the gin when the witness arrived there. One of these white men was named Russell, and another Roberts. Witness was present at the inquest held by justice Smith, and wrote down the testimony, but did not remember who constituted the jury. Witness was taking no particular interest in the prosecution, but had said that if the defendant got his just dues he would be hung. Cellis Holman was feeding the gin on the day of the killing. The defendant was at the time, and had been for three months, in the employ of the witness. Witness knew of no difficulty between the defendant and Cellis Holman. With reference to this witness's testimony, the transcript recites as follows:

"In the absence of defendant's counsel, the district attorney asked where he was, when witness replied in a low voice: 'I guess he has got enough of it.' The court did not hear the remark. The attorney for the defense had absented himself without the knowledge of the district attorney and whilst the district attorney was examining the witness."

Cellis Holman was the second witness for the State. He tes-

tified that he knew both the defendant and the deceased. The latter was killed at Nat Holman's gin in Fayette county, in the month of October, but witness could not recall the year. Wit- ness was present when the deceased died. He was also present and testified before the coroner's inquest. Witness was feeding the gin on the day of the homicide. The duty of the defendant in the gin was to shovel up cotton seed in the small room con- taining the gin stand, and take them to the stalls in the large room. For this purpose he used a large iron shovel, which is the weapon with which he killed the deceased. He had often used the shovel and was familiar with it.

While witness was at his work at the gin stand on that day, the defendant brought him a woman's sack, saying that he had just bought it from a peddler down stairs, and asked if witness thought it large enough for his, defendant's wife. Witness told him to try it on, and that if it would fit him it would fit his wife. About this time the deceased came up stairs and asked witness if he did not wish to purchase something. Witness replied that he did not, that he had no money. Deceased replied: "Yes, you have plenty of money." Witness then told him that possi- bly he would go down stairs presently and look at his goods. Deceased then turned to go down stairs, when defendant de- manded of him to take the sack back, as it would not fit his wife. The deceased looked back and said: "I don't do business that way; that is the way children do business," and walked on. Defendant thereupon reached back and secured the iron shovel. He caught it by the handle, threw it up in a striking position, and followed the deceased. When defendant got just about the corner of the partition dividing the first cotton stall nearest the gin stand on the right hand side going from the gin stand to the front door, the witness saw him strike forward with the shovel. Witness could not see Finkelstien, the deceased, at that time, as he had passed the said partition, but could see the defendant plainly. He saw the shovel as it went down, but could not see what it struck, as, when it went down, the shovel part passed down on the other side of the partition from the witness. The gin was running at the time, and making so much noise that the witness could not hear the sound of the blow, or whether any thing was said when it was inflicted.

After striking the blow the defendant came back to the gin stand, threw down the shovel, and said: "D——n him, I got him!" Witness stopped the gin, ran around to the place where

he saw the defendant strike the blow, and found the deceased lying forward on his face, in the walk, with his head at a point about opposite the middle of the second stall. He had a wound on the right side of his head, just back of the ear, and was bleeding profusely. The defendant came up, and witness asked him: "Sam, what did you kill the man for?" Defendant looked at the man, laughed, said nothing, sprang out of the window and ran towards the river bottom. Witness ran to the door and called a man who came with the deceased to the gin, told him Finkelstien was killed, and he and witness, after washing deceased's face, carried him down stairs and laid him on some cotton bagging under the cotton shed. Witness saw the defendant plainly when he struck the blow. Witness, defendant and deceased were the only parties in the gin at the time of the killing.

Witness saw no more of the defendant until at the previous term of this court. He, witness, showed Nat Holman the shovel with which the blow was struck on the same day. It was a heavy shovel with a handle three or four feet long. The shovel was usually used with both hands. Defendant held it in his right hand when he struck the blow. Defendant did not offer to assist the witness, either to wash deceased's face or to take him down stairs. He merely looked at deceased after he had felled him, laughed and ran off. Witness thought he could recognize the man who was with the deceased on that day, and pointed out a man present in court as the individual. He was not certain the individual indicated was the man, but believed him to be.

Cross-examined, the witness stated that the deceased had a whip in his hand when he came into the gin, and still had it when he started out. It was rather a large sized whip, but witness did not take close enough notice of it to be able to describe it. It was lying near and at the side of deceased when witness got to him after he fell. Witness did not on a former trial of this case say that after the deceased fell he still held the whip in his hand. Deceased made no effort or demonstration to strike the defendant with the whip. If he had, witness would have seen it. Witness at no time told Tom Braker and Felix Bridge that he did not see the killing. Witness said nothing before the inquest about the defendant laughing after the deceased fell, because no question was propounded to him on that point. He merely stated that defendant looked at the man and ran off.

Previous to this killing witness and defendant had had difficulties—one or two little fights—but had made friends, and witness had no grudge against him at the time.

The witness denied that he had at any time after the killing told Handy Holman that he now "had Sam just where he wanted him;" that he "was the only witness against him and could swear what he pleased." He had never threatened to "get even" with the defendant. Witness did not examine the sack purchased by the defendant. When defendant asked him if the sack would fit his wife, witness told him that it would if it would fit him. There were three stalls on each side of the big room. Witness was standing at the gin stand, feeding it when the blow was struck, and was facing the big room. To feed a gin requires care, but in feeding one the witness could look about and around without cutting his fingers in the gin. Witness denied that he had ever said to defendant's counsel that, when he asked defendant why he had killed the peddler, the defendant asked: "What! have I killed him?"

Re-examined by the State, the witness testified that he was standing some nine or ten feet from the defendant when he struck the blow, and was looking directly at him. The deceased could not have struck the defendant without the witness seeing him. Witness did not know the exact distances in the gin, and when he spoke of distances did so upon opinion. When witness went to the deceased after he had fallen, the whip lay a little to his right on the cotton seed. Deceased had the whip in his hand when he started off. The first stall on the right hand side going from the gin stand to the front door is partitioned from the second stall by a plank partition about seven feet high, but on the side nearest the gin stand there was no partition between the first stall and the way leading from said gin stand. The cotton seed in said stall was kept from falling in by an old press door, which was about four feet long, and three and a quarter feet wide. Witness could easily see over said door, and there was nothing to obstruct his view beyond, between the gin stand and the dividing partitions between the first and second stalls.

M. Lauderstien was the next witness for the State. He testified that he was the man pointed out by the last witness as the companion of the deceased at the time of the killing. The witness Cellis Holman, was mistaken; this witness was not the companion of deceased on that occasion. The deceased's companion at that time was one Caimer, now in Mississippi or Kentucky.

The witness, however, had traveled with deceased before his death for five years, peddling, and they were together on Holman's place about a week before the killing. The witness Cellis Holman had often seen this witness and deceased together. Here the State closed.

T. W. Smith was the first witness for the defense. He testified that he was a justice of the peace at the time of the homicide, and held the inquest on the deceased's body. The papers containing the evidence were handed by witness to B. D. Shropshire, county attorney, and he failed to turn them over to the proper officers; for which failure the witness was indicted. Witness had not since seen the said papers, and had no idea what had become of them, nor could he now remember their contents. Witness could not remember the parties who constituted the coroner's jury. At this point the district attorney stated that he would admit the loss of the papers, and consent that parol evidence be received of their contents.

C. Michaelis was the next witness for the defense. He testified that he was a carpenter by trade, and that he could draw a correct diagram of a given place. He drew the diagram in evidence, which is a diagram of the Nat Holman gin, in Fayette county. It was prepared on the day preceding this trial by the witness, who, for the purpose of drawing it, visited the said gin in company with the defendant's counsel and two colored men. The spots in the center of the building, as indicated on the diagram, represented blood spots, though witness could not of his own knowledge say that they were blood spots. The witness, however, saw the spots. They were on a small square movable platform in that room, which platform covered the hole in the floor through which the shaft passed when the gin was in motion. The large room is thirty-four feet long. The distance from the gin stand to the blood spots is twenty-eight feet. There are stalls for cotton on each side of the large room, but there were no partitions in them when witness was at the gin. It would depend upon the height of the partitions whether a man could see from the gin stand to the middle of the second stall.

Cross-examined, the witness stated that, if the partition between the first stall on the right as you go from the gin and the way running between the stalls was a door four feet by three and a half feet, a man at the gin stand could easily see to the corner of the partition between the first and second stalls.

I. B. Holloway, district clerk, testified, for the defense, that

he was district clerk when Finkelstien was killed. He knew nothing about the papers containing the proceedings of the coroner's inquest in that case. He had never seen such papers.

Handy Holman was the next witness for the State. He testified that, when Finkelstien was killed, he was in the field on the Nat Holman place. Witness had a conversation with Cellis Holman a few days after the killing occurred, in which he asked Cellis if he saw the killing, to which Cellis answered that he only saw the defendant raise the shovel and make the blow; that he did not see the blow when it fell. Cellis Holman and the defendant had a difficulty a short time before the killing.

Tom Braker testified, for the defense, that he lived on Nat Holman's place, and was familiar with the gin house. Witness was at the gin house a few days before this trial, along with the attorney for the defense and other gentlemen, and pointed the blood spots out to them. Witness knew them to be blood spots, because he saw them shortly after the killing. There were stalls on each side of the big room, six or seven feet high. A man standing at the gin stand could not see the point where the blood spots were. He could, however, have seen a man throw up a shovel with a five foot handle. Witness could not say that a man standing a few feet back from the blood spots could not be seen from the gin stand. The partition between the end of the first stall, near the gin stand, and the walk leading by it was not, at the time of the killing, constructed of an old three foot door, but was a partition six or seven feet high. This the witness knew, because his cotton was in that stall. Witness saw the woman's sack, which was the cause of this difficulty. It was old, moth eaten and full of holes. "If a man was standing behind the blood spots, and another was standing a few feet behind him, and nearer the gin stand, a person at the gin stand could see the latter, but not the former."

Felix Bridge testified, for the defense, that he was picking cotton in the neighborhood at the time of the killing. Soon after the homicide occurred, Cellis Holman sent for the witness and explained to the witness how the homicide occurred. He said that the deceased was a peddler, and, at the gin, sold the defendant a sack, with which the defendant became dissatisfied; that defendant asked him if he, Cellis, thought it would suit his, defendant's wife; that he, Cellis, replied to the defendant: "It may suit you, but it won't suit your wife;" that thereupon defendant offered the sack back to the peddler, and demanded re-

turn of the purchase money; that the pedler replied: "I do not do business that way," and turned and walked off, when the defendant picked up the cotton shovel and followed; but that he, Cellis, did not see the defendant when he struck the blow.

On cross-examination, the witness stated that he was the defendant's father-in-law. This conversation occurred a few days after the killing. The witness, at that time, was somewhat excited about the affair. No one was present at this conversation, save the witness, Cellis and the peddler's partner. Others came up afterward.

Monroe Richardson testified, for the defense, that he was in the neighborhood when the killing occurred. Cellis Holman told him about the attendant circumstances the day after the homicide occurred. He said, in that connection, that the defendant came running by him, and said: "I have hit that fellow;" that he went up to the man, and asked the defendant: "Sam, what did you kill this man for?" That defendant replied: "What! Have I killed him? Is he dead?" and then jumped out of the window, and ran off.

Witness worked for Mr. Nat Holman, and was familiar with the gin. A man could not occupy the gin stand and see to the middle of the second stall; at least, the witness could not. There were stalls on each side of the big room. Witness did not know the height of the partitions.

Cross-examined, the witness stated that he did not know whether or not the partition nearest the gin stand was formed of a small door. No one was with witness when he had the conversation with Cellis, deposed to. Witness had not thought of that conversation since, until called upon to testify in this case. Nothing has occurred to fix this conversation in the witness's mind. Witness had had no other conversation with witness Cellis. Here the defendant rested.

In rebuttal, the State produced several witnesses who testified that the reputation of the State's witness Cellis Holman was above reproach or suspicion.

Nat Holman, recalled for the State, testified that an old press door, four feet by three and a half, was used to enclose the side of the first stall nearest the gin stand, which side was not planked up. It was thus used to prevent cotton seed from falling out on the walk. When used for this purpose, it was set up on its side. When not in use, it generally lay flat on the floor. Witness did not know its position on the day of the homicide.

The general and requested charges are here incorporated in full, in accordance with the direction of the court. The general charge reads as follows:

"The defendant is on trial, charged with the murder of Wm. Finkelstien, and pleads not guilty

"Every person of sound memory and discretion, who shall unlawfully kill any reasonable creature in being, within this State, with malice aforethought, either express or implied, shall be deemed guilty of murder. Murder is distinguishable from every other species of homicide by the absence of the circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the offense.

"All murder committed with express malice is murder in the first degree, and all murder committed with implied malice is murder in the second degree, and the distinction between express and implied malice determines whether murder is of the first or second degree.

"Malice means that state of a wicked and depraved mind fatally bent upon mischief.

"The important inquiry in determining the existence of express malice is, do the external circumstances, the acts and the conduct of the accused at the time, before and subsequent to the killing, if such there be, indicate a cool and deliberate mind and formed design to kill? If so, there is express malice.

"There is no certain or definite space of time necessary to intervene between the formed design to kill and the fatal blow. A single moment of time may be sufficient. All that is required is that the mind be cool and deliberate in forming its purpose, and that the design to kill is formed.

"If you believe from the evidence that the defendant did kill Wm. Finkelstien with express malice as before defined, you will convict him of murder in the first degree.

"Implied malice is what the law implies from every voluntary killing of a human being, when the circumstances, upon one hand, show no express malice, nor upon the other any excuse, justification or mitigation, nor reduce the offense to manslaughter. Every voluntary killing of a human being without deliberation, from some rash, inconsiderate impulse, would be upon implied malice, and would be murder in the second degree.

"If you believe the defendant did kill William Finkelstien

42

without express malice, yet if you believe such killing was committed under such circumstances as that malice is implied, as before defined, you will convict of murder in the second degree.

"If you have any reasonable doubt of the guilt of the accused, you will acquit, and so you will acquit of any grade of the offense of which you have any reasonable doubt. If you find the defendant guilty of murder in the first degree, you will assess his punishment at death, or by confinement in the penitentiary for life.

"If you find him guilty of murder in the second degree, you will assess his punishment by confinement in the penitentiary not less than five years; in either case stating the degree of murder.

"The jury are the judges of the credibility of the witnesses, and weight of the testimony.

"L. W. MOORE, Judge."

The requested and refused charges read as follows:

"First. The jury are the sole judges of the weight to be given to the testimony of each witness, and the credibility of each witness. They can discard a portion of the testimony of a witness or all of his testimony. A witness may be impeached by his own contradictory statements, or by his character for truth and veracity in the neighborhood in which he lives being successfully attacked. In either case the jury has the privilege of discarding his evidence.

"Second. Although the law implies malice in case of unlawful killing by means calculated to produce death, still in such case the burden of proof does not shift from the State to the defendant, but the burden remains on the State to prove the degree of the offense *aliunde* the actual killing.

"Third. Every person is presumed to understand the probable result of his acts, and when an unlawful act is clearly shown to have been committed, it is for the defendant to show facts which mitigate, justify or excuse, so that a reasonable doubt at least may arise upon the entire evidence as to his guilt. If the jury believe from the evidence that the deceased, William Finkelstien, said anything or committed any act at the time of the killing, which would mitigate, justify or excuse the killing, they should take into consideration such saying or act, and find their verdict accordingly; that is, either find the defend-

ant guilty of some lower grade of offense than murder in the first degree or acquit the defendant.

"Fourth. (Murder in the first degree has been defined to you.) A murder committed under the influence of sudden rage, resentment, passion or anger at some insult offered or wrong done to the defendant by the deceased, at the time of the killing, cannot be murder in the first degree unless coupled with something said or act done by the defendant at the time, before or after the killing, tending to show malice as defined by the statute.

"Fifth. In impeaching a witness by proving his bad character for truth and veracity, such character must be notorious in his neighborhood, and while the proof may be made by one witness, still, in weighing the evidence, the production of one witness would not ordinarily be satisfactory. So, in proving that his character is good for the same, it should be notoriously good in the neighborhood, and one or two witnesses to that fact will not ordinarily suffice."

"These charges are refused because, so far as they are correct legal propositions, and so far as the facts require the application, they are embraced in the charge of the court.

"L. W. MOORE, Judge."

"If the jury believe from the evidence that there has been no malice proven, either express or implied, they cannot convict the defendant of murder in the first degree.

"Where the fact of the killing has been clearly shown, and that it was done under such circumstances as in law will mitigate, excuse or justify the act, the law in such cases implies malice, and makes the killing murder, but it would be murder of the second degree."

"Refused because embraced in the charge of the court.

"L. W. MOORE, Judge."

The motion for new trial embraced the questions involved in the opinion

*A. S. Chevalier,* filed an able brief for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. The appellant, Sam Lewis, was indicted for the murder of William Finkelstien, a peddler, on the twenty-first of October, 1879. He was tried and convicted of murder in the first degree; his punishment being assessed at confinement in the penitentiary for life. From this judgment and sentence he appeals and relies upon a number of assignments of error.

His first error is the action of the court in overruling defendant's motion to quash the venire upon the ground of the insufficiency of the return of the sheriff touching his diligence to find and summon certain veniremen. In regard to the jurors not summoned the return of the sheriff is as follows: "And the following named persons whose names appear upon said venire were not summoned for the following reasons, to-wit: F. Kendel, W. Carles, C. H. Burns, D. P. Croft, John Burk and W. S. Lane, are all out of Fayette county, and could not be found in said county although diligent search was made for them by the sheriff of Fayette county and his deputies; and H. C. Gerdes, John Frierson, A. Groos, W. Dick, August Mischer and N. M. Cockrell were not found in Fayette county although diligent search was made for them at their residences and places of business, and at any point at which they were likely to be found by the sheriff of said Fayette county and his deputies." Article 614, Code Criminal Procedure requires the diligence to be stated. This return, we think, fully complies with the Code, and, if true, great pains was taken to summon these jurors.

By the second assignment it is insisted that the court erred in overruling defendant's motion for continuance.

Jack Lewis, of Colorado county, S. Smith, of Bastrop, and Handy Holman, of Fayette, were the witnesses desired. Lewis was attached by the sheriff of Colorado county, and was released by the order of John Mitchell, Esq., on the fifteenth day of November, 1882. Defendant in his motion states that Mitchell was not an attorney in the case, and that he was not authorized to release this witness Lewis. This may be true. The question, however, is one of diligence. Lewis was discharged on the fifteenth day of November, and the cause was not reached or called for trial until the twenty-third of that month. We are not informed by defendant's motion at what time he learned that Lewis had been released from the attachment. It may have been the same or the next day, leaving ample time for an-

other attachment to have been issued, served and the attendance of the witness secured.

Again, the evidence of said witness Lewis is not shown to be competent. In his motion defendant says "that he expects to prove by said witness that *affiant* told witness, after the murder, * * that he did not intentionally kill deceased, but deceased struck him over the head with a buggy whip, and he returned the blow with no intention of killing the deceased." That "*affiant told witness*," etc. When and where did he tell the witness? To be admissible, the statement of affiant (the defendant) must have been *res gestæ*, and all of the facts and circumstances, the time and place, must be stated, which are necessary to show that, in fact, his statement was *res gestæ*.

By the next witness the defendant expected to prove "that there existed in the county so great a prejudice against defendant that he could not obtain a fair and impartial trial in said county; that he is a material witness on a motion for change of venue. A sufficient answer to this is that there was no motion made for a change of venue. If defendant had filed his motion for that purpose, and desired witnesses to establish his right to a change, the court no doubt would have caused proper process to be issued, and would have given defendant time to assert his right in regard to this motion. But, as there was no effort made to assert his right to a change of venue, we presume the defendant abandoned this purpose.

The other witness is Henry Smith. By this witness defendant expects to prove "that Holman (a very important witness for the State) before the jury of inquest did not swear that affiant laughed when he saw that deceased was dying." It is not stated in the motion for continuance that Holman said anything upon this subject at all. His attention was not called to this matter, nor does it appear (from the motion) that the negative of what the witness swore on the trial was even so much as hinted at in his testimony before the inquest.

That a witness fails to state everything that was done and said by the parties at the time of the occurrence of the facts to which he swears is not a contradiction. To be such, he must make a statement in regard to the fact. If he omits a fact, his attention should be drawn to it, or, if he is asked if what he has stated was all that was said by the party or parties, and he answers in the affirmative, and upon the trial he embraces other facts, in his evidence, than those related by him before the in-

quest, the defendant would have the right to show this. This, however, is not the state of the question in the case in hand. As presented to us by the record, Holman simply testified to some facts which were omitted in his evidence before the inquest, and these not in conflict but harmonious with his evidence there given.

The court did not err in overruling the motion for continuance.

It is assigned as error that the court erred in holding the juror Zreemer competent. This juror was challenged peremptorily, and the defendant did not exhaust his challenges. It is now settled by this court that, to complain of the action of the court in erroneously holding a juror competent, the defendant must exhaust his peremptory challenges. We are of the opinion, however, that the juror was impartial and competent. The juror stated that when he heard of the killing "he said the defendant ought not to have killed the deceased, but that he had formed no opinion, nor then had any opinion about the case."

Fourth assignment is "that the court erred in permitting Nat. Holman, a witness for the State, but one who was not present at the killing, to give his opinion of the manner in which the blow was struck, and the relative position of the parties, when the State had failed to show witness to be an expert in such matters." Holman described the wound minutely, and the shovel (the weapon used), and then gave his opinion that, "if the wound inflicted on Finkelstien was made with the shovel, he must have been hit with the eye of it; no other part of the shovel could make the same kind of a wound as was on him." This evidence, to wit, the witness's opinion, was not competent. But was the defendant injured by it? We think not. The wound was of that character, taken in connection with the formation of the shovel, as to place it beyond cavil that, if inflicted with the shovel, it must have been with that part known as the eye. This opinion of the witness was perfectly patent, and, whether expressed or not, the jury would have irresistibly reached the same conclusion. If the State had been seeking to identify the weapon with which the blow was inflicted, by this evidence, we would hesitate before sanctioning such means. This, however, was not the case, there being an eye witness to the fact that the blow was inflicted with the shovel.

5. "During the progress of the trial the honorable judge absented himself from the court room, and remained outside without notifying counsel. The counsel for State continued to

examine his witness in the absence of the court, and when counsel for the defense arose to object to his manner of interrogating the witness, no court was present to sustain or overrule the objection to the evidence, and during this interval illegal and damaging evidence to the defense went to the jury." The record informs us "that the presiding judge retired under a call of nature for a brief minute, supposing the counsel would take notice thereof. Counsel for defendant did not complain of any testimony introduced in his absence, but stated that he had offered objections to some testimony, and that counsel for both parties said they waited his return and then presented the objection to the testimony."

In the first place, we are not informed of what the illegal and damaging testimony complained of by defendant consisted. This is fatal to the bill of exceptions. Again, the momentary absence of the presiding judge during the examination of a witness, under the circumstances mentioned in the record, will not of itself justify this court in reversing the judgment. If illegal or improper evidence had been introduced by the State, over objection of defendant, during this absence, a motion to exclude would have resulted to his relief against such evidence. But we cannot hold the opinion of counsel that there was illegal evidence admitted; the facts must be set out that this court may pass upon their illegality. Notwithstanding the very high respect in which the counsel for defendant is held by this court, we must be permitted to say that we view this whole matter as frivolous.

Sixth assignment: "The court erred in admitting the evidence of Holman (a witness for the State) as to the murder, when the said witness knew nothing about the date of the killing, not even being able to give the year of the killing." The date of the killing was very clearly proven by other witnesses. The witness Holman referred to the same homicide. That he failed to remember the year is no objection to the competency of his evidence.

6½. "The court refused to grant the defendant time to take down the testimony." In this there was no error.

7. The court refused to give any of the charges asked by the defendant. The proper charges requested were embraced in the charge of the court. The other charges refused were without facts, or were upon the weight of the evidence, and were properly refused.

.7½. "The court refused to admit the evidence of T. W. Smith, the justice of the peace who sat on the inquest held over the body of the deceased in 1879, in the absence of the papers." What papers ? We may presume that the testimony taken before the jury of inquest was reduced to writing. But certainly bills of exception should be more specific. What facts did defendant propose to prove by this witness ? We know not. Were they competent and beneficial to the defendant ? Here again we need light. But the explanation of the learned judge, we think, shows, that there is nothing whatever in this billl. We are informed by the record that the State admitted the loss of the papers, and. offered to permit any testimony showing their contents, and that the loss was known upon a former trial, and it was only as to the loss of the papers that the court would not hear further testimony by Smith. What necessity was there for any proof of the loss of these papers by Smith or any other witness, when their loss was an admitted fact ?

8. The court gave verbal instructions to the jury, to wit: "that they should not cast lots in coming to a verdict." In this there was no error.

9. "The court erred in the charge." The bill of exceptions points out no error in the charge. However, this being a felony, the charge of the court has been thoroughly examined, and we find that the law applicable to the case made by the evidence was fully and clearly given in charge to the jury.

10. "The court erred in refusing to grant a new trial in the case, on the grounds set forth in the motion of defendant therefor." In addition to some of the matters already mentioned, the motion for new trial contained two others: 1, newly discovered evidence; 2, that the verdict of the jury is contrary to and not supported by the evidence. This newly discovered evidence consists of the facts set forth in the affidavit of B. D. Shropshire, Esq., in regard to those lost papers, already mentioned in this opinion. Neither the motion for new trial nor the affidavit of Shropshire indicates that a material fact, beneficial to the defendant, could be established by those papers, if found. The motion seeks a new trial upon the ground that there is a probability of finding those papers. Suppose they should be found, how would defendant be benefitted by them? To authorize a new trial upon this ground, this must be shown in such clear light as to place it beyond doubt. To be explicit: 1. The newly discovered evidence must be made to appear material. 2. Not

in conflict to such extent as to render its truth improbable. 3. It must be beneficial, exculpatory, in its nature.

Appellant being convicted of murder of the first degree, it is urgently insisted by his learned counsel that the evidence fails to support the verdict finding him guilty of that offense; and it is very plausibly argued by counsel that, as there was no proof that defendant took the life of deceased by starving, torture, etc., or by lying in wait, or that he had threatened to kill him, or entertained grudges against him, or had concocted schemes to do him bodily harm, that, therefore, there was no proof of express malice. In this we cannot agree with counsel for defendant.

Express malice is where one with a sedate and deliberate mind and formed design kills another; and this formed design is evidenced, proven, by external circumstances discovering that inward intention; and this formed design, inward intention, is discovered, made manifest, by such external circumstances as taking life by starving, torture, etc., or by lying in wait, or antecedent menaces, former grudges and concocted schemes to do bodily harm. These are illustrations of the external circumstances which discover the formed design, the inward intention, but they do not exhaust the whole field of facts and circumstances by which the formed design, the inward intention, may be discovered.

If it is shown by any fact or circumstances—is made manifest —that one with a sedate and deliberate mind and formed design, kills another, the killing would be upon express malice, and these external circumstances discovering the formed design may transpire at the time of the killing, as well as before. "For though the killing be upon a sudden difficulty, it may be attended with such circumstances of enormity, cruelty, deliberate malignity, cool calculating compassings, or even calm demeanor and absence of passion, as will be sufficient evidence to establish the inference that the killing was the result of a sedate, deliberate mind and formed design to take life or do some great bodily harm. Acts and admissions or other language of the prisoner, even after the mortal stroke or killing, may often be pertinent evidence as tending to show express malice at the time of the killing." The last two rules apply with great force to the facts in this case.

(The Reporters will give the statement of facts, charge of the court, and the refused charge.)

We are of the opinion that the evidence supports the verdict. We have given every question raised by the record and brief of counsel our most careful consideration, such consideration as the gravity of the case demands, and have not discovered an error in the record such as will warrant a reversal of the judgment.

The judgment is affirmed.

*Affirmed.*